UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| TONY GOODRUM, | ) | Case No. 07-CV-0752-J (JMA) |
| | ) | |
| Petitioner, | ) | **REPORT AND RECOMMENDATION OF** |
| | ) | **UNITED STATES MAGISTRATE JUDGE** |
| v. | ) | **ON PETITION FOR WRIT OF HABEAS** |
| | ) | **CORPUS** |
| M.C. KRAMER, Warden, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**I.   <u>Introduction</u>**

Tony Goodrum("Petitioner"), a state prisoner proceeding pro se, filed a Petition for Writ of Habeas Corpus (the "Petition") pursuant to 28 U.S.C. § 2254 challenging his San Diego Superior Court conviction in case number SCD170068 for voluntary man-slaughter and personal use of a firearm. (Doc. No. 1; Lodgment No. 1, Clerk's Transcript ("CT"), at 276.) Petitioner contends that the trial court instructed the jury improperly and that it abused its discretion by improperly admitting evidence of a prior conviction. (<u>See</u> Petition, Grounds One, Two, and Three.)

The Court has considered the Petition, Respondent's Answer [Doc. No. 9], Petitioner's Traverse [Doc. No. 12], and all the

supporting documents submitted by the parties.  Based upon the

documents and evidence presented in this case, and for the

reasons set forth below, the Court recommends that the Petition

be **DENIED.**

## II.   **Factual Background**

This Court gives deference to state court findings of fact

and presumes them to be correct.  Petitioner may rebut the

presumption of correctness, but only by clear and convincing

evidence.  28 U.S.C. § 2254(e)(1); see also Parke v. Raley, 506

U.S. 20, 35-36 (1992) (holding findings of historical fact,

including inferences properly drawn from such facts, are entitled

to statutory presumption of correctness).  The facts as found by

the state appellate court are as follows:

> [¶] Goodrum lived with his girlfriend Ieisa Wilson, her
> two children, and another couple in a house on
> Brookhaven Road.  Goodrum and the victim, Dwayne
> Stamps, were friends.  About a year earlier Stamps had
> rented a room in the Brookhaven house for a few months.
> In the past, Goodrum and Stamps had argued, even to the
> point of pushing or shoving each other, but they had
> never had a fist fight and Stamps had never made any
> threats to kill Goodrum or anyone else.  Goodrum and
> Stamps had not seen each other for several months.
> Some animosity had developed between them because
> Stamps had borrowed and not returned Wilson's car
> (Wilson and Goodrum viewed it as a theft of Wilson's
> car).
>
> [¶] On September 24, 2002, Stamps had been terminated
> from a drug rehabilitation program, his girlfriend
> Lorraine Murray had complained about not being happy
> with the relationship, and he had backed her vehicle
> into a pole or tree, damaging it.  After stopping at a
> bar, Stamps and Murray drove to the Brookhaven
> residence, arriving about 9:00 p.m.  At the time of his
> death, about 30 minutes later, Stamps had a blood
> alcohol level of .17 percent.
>
> [¶] When Stamps and Murray arrived, the garage door to
> the Brookhaven residence was propped open six to seven
> inches with a pipe.  The lights were on in the garage,
> which was often used by the residents of the house as
> an additional living space.  Goodrum was inside the

2

garage with a woman playing dominoes. Goodrum, the woman, and her friend had used methamphetamine that day "for a few hours at least."

[¶] When Stamps knocked loudly on the garage door, Goodrum responded by opening the door. Stamps walked in and said he was looking for Jason Cruz who had his earring and other belongings. He was rude to the woman, suggesting in a lewd manner that he knew her and told her that if she saw Cruz to tell him that he was going to kill him.

[¶] Stamps entered the house, took Wilson into the bedroom and accused her of saying "mean things" about him. According to Wilson, Stamps threatened to kill her. When Goodrum entered the bedroom, Stamps accused Goodrum of having his diamond earring. Goodrum said the earring was in a duffel bag, which he took out of a closet, carried out to the garage, and set down in front of Murray's vehicle. Stamps and Goodrum argued in the garage and exchanged blows both in the garage and in front of Murray's vehicle. According to Goodrum, Stamps said he was going to get a gun and shoot everyone in the house.

[¶] Stamps went to Murray's vehicle and pulled out a roofing hammer, which was described as looking like a tomahawk, hatchet, or axe. According to Goodrum, Stamps threatened, "I'm gonna fuck you up. I'm gonna fuck you up." Goodrum pulled out a knife and picked up a trash can with his other hand. The men continued arguing but did not raise their weapons. Goodrum told Stamps to leave.

[¶] There were other people in the garage area, including the woman with whom Goodrum had been playing dominoes, Murray, and Goodrum's friend Howard Herring. According to some witnesses, things calmed down; both men put down their weapons, they hugged, Stamps apologized, and said he loved Goodrum as a brother. According to Goodrum, things did not calm down. Stamps made a comment that he was "gonna get [his] strap and shoot everybody in the house." Goodrum responded he was going into the house and when he came back he was "gonna be shootin' sparks." Goodrum retrieved a rifle from between the mattress and box springs of the bed in the master bedroom. He cocked the rifle in the bedroom.

[¶] When Goodrum entered the garage with the rifle, Stamps stood near the rear of the driver's side of a car parked in the garage. When Stamps became aware of the gun, he said something like, "Go ahead and shoot me." According to several witnesses, including neighbors, Stamps was not holding anything in his hands. A neighbor across the street saw Goodrum

advance toward Stamps.  Herring and Goodrum, as well as another neighbor, testified Stamps started walking toward Goodrum.  Goodrum fired twice at Stamps, hitting him once in the head and once in the chest.

[¶] Herring testified that after the first shot, Stamps turned, grabbed his stomach and said something like, "I can't believe you shot me."  Herring saw blood in the area of Stamp's heart.  As Stamps turned, Goodrum fired a second shot and Stamps collapsed to the ground.  According to Murray, the first shot hit Stamps in the face and he staggered.  The second one hit him in the heart, he fell to the ground, and Goodrum was preparing to fire again when Murray shouted at him to stop.

[¶] According to Goodrum, when he entered the garage, Stamps commented in a sarcastic or mocking tone of voice, "Oh, he's got a gun.  What are you gonna do with a gun?"  Goodrum thought Stamps was hiding something behind his back, possibly a gun.  Stamps kept advancing despite Goodrum's warning him that he was going to shoot if Stamps came any closer and that he was "a damn good aim."  Goodrum fired when Stamps started moving a pipe from behind his legs.  After the first shot, Stamps continued to swing the pipe up, so Goodrum fired again.  A pipe was later found near Stamp's body.

[¶] Stamps died as a result of the gunshot wounds, either of which was potentially fatal.  The head wound likely would have caused immediate unconsciousness and it would have been unlikely Stamps would have been able to speak or move after the wound was inflicted.  The barrel of the rifle was two feet or further from the head wound when it was inflicted.  In contrast, the barrel of the rifle was touching or nearly touching Stamps when the chest wound was inflicted.  It is possible that if the chest wound were inflicted first that Stamps might have remained standing and able to speak.

[¶] Goodrum presented evidence that after the shooting Murray had told some people earlier in the evening Stamps stated he thought he was going to die that night and purposely drove into ongoing traffic and hit a light pole, in an effort to kill them both.  She said Stamps was upset about being terminated from the drug rehabilitation program and was afraid if he "got a dirty test" he would be sent back to jail.  He told her he was not going back to jail; they would have to kill him first.  She also said Stamps had grabbed a pipe and had advanced toward Goodrum.  Murray denied making any of these statements.

(Lodgment No. 6, unpublished opinion of the Cal. Court of Appeal

1 filed August 19, 2004, at 2-5.)

2 **III. <u>Procedural Background</u>**

3      The San Diego County District Attorney's Office filed an

4 Information charging Petitioner with one count of murder and

5 personal use of a handgun in violation of California Penal Code

6 §§ 187(a) and 12022.5(a)(1) and one count of possession of a

7 firearm by a felon in violation of California Penal Code §

8 12021(a)(1).  (CT at 1-3.)  A jury found Petitioner guilty of the

9 lesser included offense of voluntary manslaughter (in violation

10 of Cal. Penal Code § 192(a)) and personal use of a handgun, and

11 he was sentenced to 21 years in state prison.  (CT at 201-203,

12 276-277.)[1]

13      Petitioner filed a direct appeal challenging his conviction

14 and sentence in the California Court of Appeal, Fourth Appellate

15 District, Division One.  (Lodgment Nos. 3-5.)  In an unpublished

16 opinion, the California Court of Appeal affirmed Petitioner's

17 conviction and sentence.  (Lodgment No. 6.)  Petitioner then

18 filed a Petition for Review in the California Supreme Court,

19 which was denied without comment.  (Lodgment Nos. 7-8.)

20      Petitioner filed a Petition for Writ of Habeas Corpus and a

21 Motion for Discovery Concerning Law Enforcement Officers in the

22 California Superior Court.  These were denied by written order

23 filed September 29, 2005.  (Lodgment Nos. 9-10.)  Petitioner then

24 filed a Petition for Writ of Habeas Corpus in the California

25 Court of Appeal.  The California Attorney General filed a

26 response, and the court denied the petition on April 20, 2006.

27 ────────────────

28      [1]The court found, separately, that Petitioner had suffered a
prior felony conviction pursuant to Cal. Penal Code §§ 667(a)(1), (b)-
(i), and 1170.12.  (CT at 319.)

07cv752

(Lodgment Nos. 11-13.)  Petitioner then filed another Petition for Writ of Habeas Corpus in the California Superior Court.  That court denied the petition.  (Lodgment Nos. 14-15.)  He filed a state petition seeking habeas relief in the California Supreme Court on November 3, 2006.  That court denied the petition without comment on June 13, 2007.  (Lodgment Nos. 16-17.)  While that petition was pending, Petitioner filed one more Petition for Writ of Habeas Corpus in the California Superior Court.  That court denied the petition.  (Lodgment Nos. 18-19.)

Petitioner filed the instant Petition pursuant to 28 U.S.C. § 2254 in this Court on April 23, 2007.  [Doc. No. 1.] Respondent filed an Answer on July 16, 2007, and Petitioner filed a Traverse on July 27, 2007.  [Doc. Nos. 9 and 12.]

**IV.   Discussion**

    **A. Standard of Review**

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in <u>violation of the Constitution or laws or treaties of the United States.</u>

28 U.S.C. § 2254(a) (emphasis added).

The current Petition is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  <u>See</u> <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997).  As amended, 28 U.S.C. § 2254(d) reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was <u>adjudicated on the merits</u> in State

07cv752

court proceedings unless the adjudication of the claim –

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2) (emphasis added).

To obtain federal habeas relief, Petitioner must satisfy either § 2254(d)(1) or § 2254(d)(2). See Williams v. Taylor, 529 U.S. 362, 403 (2000). The Supreme Court interprets § 2254(d)(1) & (2) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams, 529 U.S. at 412-413; see also Lockyer v. Andrade, 538 U.S. 63, 73-74 (2003).

Where there is no reasoned decision from the state's highest court, this Court "looks through" to the underlying appellate court decision. Ylst v. Nunnemaker, 501 U.S. 797, 801-806 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. See Delgado v. Lewis,

223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by Lockyer v. Andrade, supra, 538 U.S. at 75-76); accord Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving claims presented on direct or collateral review. Early v. Packer, 537 U.S. 3, 8 (2002). "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" id., the state court decision will not be "contrary to" clearly established federal law. Id.

**B.    The Trial Court's Refusal to Give an Instruction on Previous Threats By the Victim**

Petitioner contends that the trial court erred by refusing to instruct the jury that antecedent threats justified quicker measures in self-defense. (Petition, Ground One and attached pages.) Petitioner requested this jury instruction as part of his self-defense theory, which was supported by some evidence at trial, that the victim had threatened to kill him during their confrontation. (Lodgment No. 2, Reporter's Transcript on Appeal, "RT," 447-473 (direct testimony of Petitioner Tony Goodrum).)

In denying Petitioner's claim, the court of appeal stated:[2]

> [¶] Goodrum contends his voluntary manslaughter conviction must be reversed because the trial court committed prejudicial error when it refused to give an instruction that previous threats by the victim may be considered in deciding whether a defendant acted in self-defense.

---

[2]Petitioner first raised this claim on direct appeal before the California Court of Appeal, which affirmed the judgment of the state trial court in an unpublished written opinion. (Lodgment No. 6.) The California Supreme Court denied review without citation of authority. (Lodgment No. 8.) Thus, the Court must "look through" to the decision of the California Court of Appeal as the basis for its analysis. See Ylst, supra, 501 U.S. at 801-06.

07cv752

[¶] The record we have on appeal does not contain a copy of the requested instructions.  It appears Goodrum was requesting the jury be told that a defendant is justified in acting more quickly or taking stronger self-defense measures when the deceased had threatened or harmed the defendant in the past.  The court indicated it was not "inclined to include the instruction," noted the instruction on justifiable homicide in self-defense (CALJIC No. 5.12) was adequate and stated it was proper for defense counsel to argue the point.

[¶] The trial court has a duty to instruct the jury on general principles of law which are closely and openly connected with the evidence and which are necessary to the jury's understanding of the case.  (*People v. Cummings* (1993) 4 Cal.4th 1233, 1311.)  The trial court must instruct on a particular defense and its relevance to the charged offense if it appears the defendant is relying on the defense or if there is substantial evidence to support the defense and the defense is not inconsistent with the defendant's theory of the case.  (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047; *People v. Jackson* (1989) 49 Cal.3d 1170, 1199.)  Upon proper request, a defendant has a right to an instruction pinpointing the theory of defense, including an instruction on the effect of antecedent threats or assaults by the victim on the reasonableness of defendant's conduct when the defendant is asserting self-defense.  (*People v. Randolph* (1993) 20 Cal.App.4th 1836, 1841; *People v. Gonzales* (1992) 8 Cal.App.4th 1658, 1663-1664.)

[¶] "A trial court has no duty to instruct the jury on a defense – even at the defendant's request – unless the defense is supported by substantial evidence."  (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1355.)  The appellate court will not reverse for an instructional error unless there is "a reasonable probability, not a mere theoretical possibility, that the instructional error affected the outcome of the trial."  (*People v. Blakely* (2000) 23 Cal.4th 82, 94, italics omitted.)

[¶] Here, Goodrum testified that previously he and Stamps had engaged in verbal arguments involving, at most, some pushing or shoving and had never had a fist fight with Stamps nor had Stamps threatened to kill anyone before.  Further, Goodrum testified that generally he was not afraid of Stamps.  During his police interview, Goodrum denied having been afraid of Stamps in the past.  In other words, Goodrum's testimony and statements indicated Stamps had not threatened or assaulted him in the past and, indeed, he was not afraid of him.

[¶] To support his claims the antecedent threats instruction should have been given, Goodrum point to: (1) his awareness Stamps had a previous conviction for a violent felony;[3] (2) Herring's testimony that when Stamps first entered the residence, Stamps acted "like a wild man," grabbed a lamp and acted as if he were going to hit Herring;[4] (3) Stamps's threats that evening to kill Jason Cruz, Wilson, and Goodrum; (4) Stamps's engaging in a fist fight with Goodrum; (5) Stamps's assault of Goodrum with a roofing hammer while saying, "I'm gonna fuck you up. I'm gonna fuck you up"; and (6) other evidence of Stamps's hostility and anger to others prior to the shooting.

[¶] The record shows that, other than Stamps's prior conviction, these violent statements and conduct occurred over a relatively brief period of time, just prior to the shooting, that is, between "about" 9:00 p.m. when Stamps arrived at the Brookhaven residence and 9:37 p.m. when a neighbor reported the shooting. Aside from Stamps's prior conviction, these acts and statement did not occur on a prior occasion – the situation addressed by the antecedent threats instruction – but were part of the series of acts and statements that led up to the shooting. Thus, they did not warrant giving the instruction.

[¶] Moreover, even if we were to conclude the court erred, we would not reverse. There is no reasonable possibility the jury here did not consider Stamps's violent statements and conduct prior to the shooting. The evidence was thoroughly presented to the jury and was the subject of closing argument. The jury was fully instructed on self-defense. (See, e.g., CALJIC No. 5.12, "Justifiable Homicide in Self-Defense.") The jury's verdict indicates the jury took Stamps's conduct into account. The jury, instead of finding Goodrum guilty of murder, a finding that would have been supported by substantial evidence, determined Goodrum had an honest belief in the need to defend himself and returned a verdict of voluntary manslaughter.

(Lodgment No. 6 at 6-9.)

Federal habeas corpus relief is granted "only on the ground that [the state prisoner] is in custody in violation of the

---

[3]The parties stipulated Stamps had been convicted of assault with a deadly weapon in 1998.

[4]"Herring testified after Stamps acted as if he were going to strike him, they had a friendly conversation and hugged. He testified there was no animosity between them and he believed Stamps 'was just playing.'"

1  Constitution or laws or treaties of the United States."   28

2  U.S.C. § 2254(a).   Generally, matters relating to a state court's

3  interpretation of state law do not implicate federal

4  constitutional issues.   In fact, this Court defers to and is

5  bound by a state court's interpretation of its own laws.

6  Wainwright v. Goode, 464 U.S. 78, 84 (1983); Estelle v. McGuire,

7  502 U.S. 62, 67-68 (1991).   Petitioner has provided no authority

8  to indicate that this case does not fall within that general

9  rule.   Moreover, "[a] federal court may not issue the writ [of

10  habeas corpus] on the basis of a perceived error of state law."

11  Pulley v. Harris, 465 U.S. 37, 41 (1984).

12      To set aside a conviction based on improper omission of a

13  jury instruction, the Court must find that the jury instruction

14  was not only improperly omitted, but that the omission "so

15  infected the entire trial that the resulting conviction violates

16  due process."   Cupp v. Naughten, 414 U.S. 141, 147 (1973) (citing

17  Estelle, supra, 502 U.S. at 72).   The Naughten Court also noted

18  that "we [] bear in mind our previous admonition that we 'have

19  defined the category of infractions that violate 'fundamental

20  fairness' very narrowly.' [citation omitted].   'Beyond the

21  specific guarantees enumerated by the Bill of Rights, the Due

22  Process Clause has limited operation.   [citation omitted].'"   Id.

23  at 73.   Further, "[a]n omission, or an incomplete instruction, is

24  less likely to be prejudicial than a misstatement of the law."

25  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).   Denial of a

26  proposed theory of defense jury instruction is not error if other

27  jury instructions adequately address the theory of defense.   U.S.

28  v. Mason, 902 F.2d 1434, 1438 (9th Cir. 1990).

The state court's decision was not the result of an unreasonable application of U.S. Supreme Court law. At the close of Petitioner's trial, the jury was given instructions concerning self-defense. The trial judge instructed the jury:

> [¶] The killing of another person in self-defense is justifiable and not unlawful when the person who does the killing actually and reasonably believes that there is imminent danger that the other person will either kill him or cause him great bodily injury; and it was necessary under the circumstances for him to use in self-defense force or means that might cause the death of the other person for the purpose of avoiding his own death or great bodily injury to himself.

> [¶] So the person who does the killing must actually and reasonably know that there's that imminent danger and that it is necessary under all the circumstances for him to use deadly force in order to avoid his own death or great bodily injury to himself. Remember, we're talking about murder versus voluntary manslaughter. We're talking about an actual but unreasonable belief, in the necessity to act in self-defense and use deadly force in doing so.

> [¶] A bare fear of death or great bodily injury is not sufficient to justify a homicide. To justify the taking of a life of another in self-defense, the circumstances must be such as would excite the fears of a reasonable person placed in a similar position, the party doing the killing must act under the influence of those fears alone.

> [¶] The danger must be apparent, present, immediate and instantly dealt with, or must so appear at the time to the slayer as a reasonable person, and the killing must be under a well-founded belief that it is necessary to save one-self from death or great bodily harm.

> [¶] Actual danger is not necessary to justify self-defense. If one is confronted by the appearance of danger which arouses in his mind as a reasonable person, an actual belief and fear that he is about to suffer great bodily injury, and if a reasonable person in a like situation, seeing and knowing the same facts, will be justified as to be a danger of your own death or great bodily injury to yourself.

> [¶] If a reasonable person under the same circumstances would be justified in believing himself in that danger, and if the individual so confronted acts in self-defense upon these appearances, from that fear and those actual beliefs, the right of self-defense is the

12

1    same, whether the danger is real or merely apparent.
     ...
2    ...

3    [¶] In the exercise of his justified right of self-
     defense, a person may stand his ground and defend
4    himself by the use of all force and means which would
     appear to be necessary to a reasonable person in a
5    similar situation with the same knowledge.  A person
     may pursue his assailant until he has secured himself
6    from danger even if that course likewise appears
     reasonably necessary. ...
7
(RT 831-833.)
8
          These instructions adequately addressed Petitioner's self-
9
defense theory because the terms and phrases "imminent danger,"
10
"necessary under the circumstances," "similar circumstances,"
11
"avoiding his own death or great bodily injury," "the
12
circumstances must be such as would excite the fears of a
13
reasonable person placed in a similar position," and "well-
14
founded belief that it is necessary to save one-self from death
15
or great bodily harm" allowed the jury to fully consider the
16
threats made by decedent Stamps against Petitioner.  An
17
antecedent threat jury instruction was not appropriate because,
18
as the California Court of Appeal correctly noted, the acts and
19
statements made by decedent Stamps "did not occur on a prior
20
occasion," "but were part of the series of acts and statements
21
that led up to the shooting." (Lodgment No. 6 at 8.)  In
22
addition, the instructions given were sufficient to apprise the
23
jury of the evidence it could consider in support of Petitioner's
24
self-defense theory.  Plainly, the jury not only considered, but
25
believed at least in part, Petitioner's self-defense theory
26
because it convicted him of manslaughter, not murder.
27
          Even if the trial judge erred by not specifically
28
instructing the jury as to antecedent threats, the failure to

                              13

give the instruction did not "infect the entire trial, rendering

it fundamentally unfair." Estelle v. McGuire, supra, 502 U.S. at

72. As noted above, the instructions given were sufficient to

inform the jury of the requirements for self-defense and not only

allowed for, but invited, the jury to consider the threats and

actions by decedent Stamps, whether technically "antecedent" in

nature or not. In this context, the omission of a jury

instruction solely addressing antecedent threats under state law

does not rise to the level of a constitutional violation

entitling Petitioner to habeas relief.

    Accordingly, the decision of the California Court of Appeal

was not contrary to, nor an unreasonable application of, U.S.

Supreme Court law, and the claim should be denied.

    **C.   The Trial Court's Refusal to Give a Special Instruction
        based on CALJIC No. 5.42 and Penal Code Section 198.5 -
        "Use of Force Within Residence"**

    Petitioner contends that the trial court erred by refusing

to instruct the jury that a defendant is presumed to have had a

reasonable fear of imminent death or great bodily injury in

defending himself or others against another person who unlawfully

or forcibly enters the defendant's home. (Petition, Ground Two

and attached pages.) In denying Petitioner's claim, the

appellate court stated:[5]

> [¶] Goodrum contends the trial court erred in refusing
> to give his requested instruction on the use of force
> within a residence.

---

[5]Petitioner first raised this claim on direct appeal before the
California Court of Appeal, which affirmed the judgment of the state
trial court in an unpublished written opinion. (Lodgment No. 6.) The
California Supreme Court denied review without citation of authority.
(Lodgment No. 8.) Thus, the Court must "look through" to the decision
of the California Court of Appeal as the basis for its analysis. See
Ylst, supra, 501 U.S. at 801-06.

1    [¶] The instruction, derived from CALJIC No. 5.42 and
section 198.5, stated:

2

3        "Any person using force intended or likely to
cause death or great bodily injury within his
or her residence shall be presumed to have
held a reasonable fear of imminent peril of
death or great bodily injury to self, family,
or a member of the household when that force
is used against another person, not a member
of the family or household, who unlawfully
and forcibly enters or has unlawfully
forcibly entered the residence and the person
using force knew or had reason to believe
that a unlawful and forcible entry had
occurred.

4

5

6

7

8

9        As used in this section, great bodily injury
means a significant or substantial physical
injury."

10

11    [¶] For the presumption of self-defense in section
198.5 to apply, there must be an unlawful and forcible
entry into the residence.  (See *People v. Brown* (1992)
6 Cal.App.4th 1489, 1494.)

12

13

14    [¶] Here there was no evidence of a forcible entry.
The undisputed evidence shows Goodrum, in response to
Stamps's knocking on the garage door, opened the door
and allowed Stamps to enter.  Since the evidence does
not support a finding of a forcible entry, we need not
address Goodrum's claim the court erred in concluding
there was no substantial evidence to support a finding
Stamps entered with an intent to steal Wilson's car or
to assault Goodrum with the roofing hammer.[6]

15

16

17

18

19    [¶] We find no error by the court in refusing to
instruct the jury with Goodrum's proposed "Use of Force
Within Residence" instruction.

20

21  (Lodgment No. 6 at 9-10; CT at 121.)

22  //

23

---

24    [6]"Even if we were to reach these issues, we would agree with the
trial court.  Goodrum's theory Stamps intended to steal Wilson's car
is based on an attempt to link Stamps's anger at Wilson with other
evidence of Stamps's agitation about keys to support a conclusion
Stamps was seeking the keys to Wilson's car in order to steal it.  The
evidence, however, indicated Stamps was agitated about losing the keys
to Murray's vehicle, keys that were not located until the following
day.  As to Goodrum's theory that Stamps entered with an intent to
commit an assault with the roofing hammer, we note the evidence shows
Stamps retrieved the hammer only after he and Goodrum had argued."

25

26

27

28

07cv752

1   The state appellate court's decision was not the result of

2   an unreasonable application of U.S. Supreme Court law.  As set

3   out above, to set aside a conviction based on improper omission

4   of a jury instruction, the Court must find that the jury

5   instruction was not only improperly omitted, but that the

6   omission "so infected the entire trial that the resulting

7   conviction violates due process."  <u>Cupp v. Naughten</u>, <u>supra</u>, 414

8   U.S. at 147.   Here, the record supports the conclusion that the

9   instruction was properly refused by the trial court.

10       Under California law:

11       Every person is guilty of a forcible entry who either:

12       1. By breaking open doors, windows, or other parts of a
         house, or by any kind of violence or circumstance of
13       terror enters upon or into any real property; or,

14       2. Who, after entering peaceably upon real property,
         turns out by force, threats, or menacing conduct, the
15       party in possession.

16

17   West's Ann. Cal.C.C.P. § 1159.  Petitioner himself testified at

18   trial that decedent Stamps "banged" on the garage door, "and he

19   opened the door and Dwayne Stamps came in."  (RT 449-451.)  There

20   is no evidence in the record that decedent Stamps broke into the

21   house or entered the house violently or by terrorizing the

22   occupants, nor is there any evidence that he forcibly "turned

23   out" the occupants.  In light of the absence of evidence of

24   forcible entry, the court of appeal reasonably concluded that the

25   trial court was correct in finding that the evidence did not

26   support the giving of a "Use of Force Within Residence"

27   instruction.

28   //

         Accordingly, the decision of the California Court of Appeal

16

was not contrary to, nor an unreasonable application of, U.S. Supreme Court law, and the claim should be denied.

### D. Admission of Prior Conviction in Evidence

Petitioner contends that the trial court's admission of his 1981 attempted armed robbery conviction violated his right to due process and deprived him of a fair trial. He contends that the only possible inference the jury could have drawn when confronted with the prior conviction was an impermissible one – that because Petitioner had committed a violent felony in the past, he was guilty of crimes alleged at trial. (Petition, Ground Three and attached pages.) On appeal in state court, Petitioner additionally contended that the prior conviction was improperly admitted as impeachment evidence against him. In denying Petitioner's direct appeal, the California Court of Appeal stated:[7]

> [¶] Goodrum contends the court abused its discretion in admitting his 1981 attempted armed robbery conviction over his Evidence Code section 352 objection. He contends the conviction had minimal probative value because it was remote in time.
>
> [¶] The trial court initially ruled Goodrum's 1981 conviction could not be used for impeachment because it was too remote but later admitted the prior conviction under Evidence Code section 1103, sub division (b). During cross-examination, the prosecutor asked Goodrum if he had ever used a gun before this case other than on hunting trips. When Goodrum answered, "Yes," the prosecutor elicited that Goodrum had used a gun in an attempted robbery of a former employer whom he believed owed him money. On redirect, Goodrum explained the

---

[7]Petitioner first raised this claim on direct appeal before the California Court of Appeal, which affirmed the judgment of the state trial court in an unpublished written opinion. (Lodgment No. 6.) The California Supreme Court denied review without citation of authority. (Lodgment No. 8.) Thus, the Court must "look through" to the decision of the California Court of Appeal as the basis for its analysis. See Ylst, supra, 501 U.S. at 801-06.

07cv752

conviction had occurred in 1981 and he had pleaded guilty.

[¶] Evidence Code section 1103, subdivision (b) allows introduction of evidence of a defendant's violent acts and reputation for violence if a defendant presents evidence as to the bad acts or reputation of the victim of a crime. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1083.)  Nonetheless, pursuant to Evidence Code section 352, the court may exercise its discretion to exclude such evidence if its probative value is outweighed by a danger of undue prejudice. (Evid. Code, § 352.)  Among the factors tending to undercut a finding that a defendant's prior violent conviction is probative is that the conviction occurred in the remote past and the defendant subsequently led a blameless life. (See *People v. Green* (1995) 34 Cal.App.4th 165, 182-183.)

[¶] [Evidence Code] section 352 uses the word 'prejudice' ... in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors." (*People v. Farmer* (1989) 47 Cal.3d 888, 912, overruled on other grounds as stated in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6.) "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case.  The stronger the evidence the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.  In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging."'" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

[¶] "'A trial court's exercise of discretion will not be disturbed unless it appears that the resulting injury is sufficiently grave to manifest a miscarriage of justice.  [Citation.]  In other words, discretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered.'" (*People v. Green, supra,* 34 Cal.App.4th 165, 182-183.)

[¶] Goodrum acknowledges Evidence Code section 1103, subdivision (b) authorized admission of his prior conviction, but argues the court should have exercised its discretion to exclude the conviction because it

07cv752

occurred 21 years ago.[8]  While we agree the conviction
was remote in time, it was not necessarily so remote in
time as to have not probative value, particularly since
it involved the use of a gun.  More importantly, even
if we were to conclude the court erred in admitting the
conviction, we would not reverse.

[¶] The examination on the prior conviction was very
brief.  It was not mentioned during closing argument.
The prior conviction was much less inflammatory than
the charged offense.  The prior conviction involved
only an attempted crime while Goodrum was young.  In
contrast, the charged offense was murder using a
firearm.  Further, the charged offense was committed
while small children were present.

[¶] The focus of the trial and closing argument was on
whether Goodrum was justified in killing Stamps.  The
jury evidently gave careful consideration to the
defense evidence; they rejected the prosecution's
theory Goodrum had committed either first or second
degree murder and instead found Goodrum was guilty only
of voluntary manslaughter.  There is ample evidence in
the record to support the jury's conviction of
voluntary manslaughter.

[¶] Under the circumstances, there is no reasonable
possibility the jury's verdict of voluntary
manslaughter was the result of passion or prejudice
deriving from the 1981 conviction rather than based on
the evidence presented at trial.

[¶] Goodrum contends the admission of his 1981
conviction violated his federal due process rights and
deprived him of a fair trial because it constituted
improper "other acts" evidence.  He explains "there
were no permissible inferences that the jury could draw
from the 1981 attempted robbery conviction, other than
the [improper inference] that if [he] committed a
violent felony before, he was guilty in this case."  He
contends it was highly probable the prior conviction
"had a substantial and injurious effect or influence in
determining the jury's verdict."  We disagree.  As we

_____

[8]"The Attorney General argues the 1981 conviction was not too
remote because Goodrum had not thereafter led a crime free life.
While it is true that the probation report shows Goodrum was convicted
of Vehicle Code violations and contempt of court in 1990, 1993, and
2000 and that his probation in the 1990 offense was twice revoked, the
record on appeal does not reflect that the prosecutor presented this
evidence to the court at the time it made its ruling."

07cv752

explained [above], there is no reasonable probability
the admission of the 1981 conviction adversely affected
the verdict.

(Lodgment No. 6 at 10-13.)

Prior to trial, Petitioner moved the court to disallow admission of his 1981 conviction for attempted armed robbery as improper impeachment evidence under California law. (CT 16-18.) He argued that the 22-year-old conviction was "stale" and therefore lacked any probative value and amounted to improper character and prior bad acts evidence. (Id.; CT 10.) Based on those arguments, the trial court initially ruled that evidence of the prior conviction was inadmissible. (RT 23.)

Later, the trial court ruled evidence of the felony prior admissible based on the separate legal argument that, under California law, evidence of a defendant's violent character is admissible if offered to prove conduct in conformity therewith *after* defendant has already offered similar evidence regarding the victim. (RT 56-61.)[9] At trial, the defense introduced or elicited evidence of examples of decedent Stamps' violent nature, e.g., threats to kill Petitioner's roommate Ieisa Wilson (RT 418, 424, 453), threats to attack Petitioner with an axe (RT 459), an

---

[9]Cal. Evid. Code § 1103(b) provides: "In a criminal action, evidence of the defendant's character for violence or trait of character for violence (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) is not made inadmissible by Section 1101 [inadmissibility of prior bad acts evidence] if the evidence is offered by the prosecution to prove conduct of the defendant in conformity with the character or trait of character and is offered after evidence that the victim had a character for violence or a trait of character tending to show violence has been adduced by the defendant ... ."

07cv752

attack by Stamps with a pipe (RT 500-504), and the fact that
Stamps frequently carried a pistol "in the back of his
waistband." (RT 150.) Thus, the trial court's ruling that
evidence of Petitioner's prior conviction was admissible, and the
court of appeal's affirmance of that ruling, was proper under
California law (and under analogous Fed. R. Evid. 404).[10]

In this context, under AEDPA, Petitioner is entitled to
federal habeas relief only if he shows that the state court's
reasoning "resulted in a decision that was contrary to, or
involved an unreasonable application of, *clearly established*
*Federal law, as determined by the Supreme Court of the United*
*States*." 28 U.S.C. § 2254(d)(1) (emphasis added). There is no
clearly established Federal law, as determined by the U.S.
Supreme Court, on the issue of "whether a state law would violate
the Due Process Clause if it permitted the use of 'prior crimes'
evidence to show propensity to commit a charged crime." Alberni
v. McDaniel, 458 F.3d 860, 864 (9th Cir. 2006), citing Estelle v.
McGuire, supra, 502 U.S. at 75 n.5.

Moreover, even applying general principles of due process
articulated by the U.S. Supreme Court, Petitioner is not entitled
to federal habeas relief. The California Court of Appeal's
decision indicates that, irrespective of whether the trial court

---

[10]Fed. Rule Evid. 404 (a)(1) provides in part: "Evidence of a
person's character or a trait of character is not admissible for the
purpose of proving action in conformity therewith on a particular
occasion, except ... [i]n a criminal case, ... if evidence of a trait
of character of the alleged victim of the crime is offered by an
accused and admitted ... , evidence of the same trait of character of
the accused offered by the prosecution."

07cv752

erred in admitting evidence of the prior conviction, no prejudice resulted to Petitioner because examination on the prior conviction was "very brief," it was not mentioned during closing argument, and the record contains ample evidence to support the jury's conviction of voluntary manslaughter. (Lodgment 6 at 12-13.)  Thus, Petitioner cannot establish that admitting the fact of his prior conviction resulted in a trial that was fundamentally unfair. <u>McKinney v. Rees</u>, 993 F.2d 1378, 1384-1386 (9th Cir. 1993), citing <u>Dowling v. United States</u>, 493 U.S. 342 (1990); <u>see also</u> <u>Henry v. Estelle</u>, 993 F.2d 1423, 1427 (9th Cir. 1993).

Accordingly, Petitioner has not shown that the California Court of Appeal's decision was contrary to clearly established U.S. Supreme Court law or the result of an unreasonable determination of the facts in light of the evidence, and the claim should be denied.

**V.   Recommendation**

After a thorough review of the record in this matter, the undersigned magistrate judge finds that Petitioner has not shown that he is entitled to federal habeas relief under the applicable legal standards.  Therefore, the undersigned magistrate judge hereby recommends that the Petition be **DENIED WITH PREJUDICE** and that judgment be entered accordingly.

This Report and Recommendation is submitted to the Honorable Napoleon A. Jones, Jr. United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).

07cv752

**IT IS ORDERED** that not later than **February 15, 2008**, any party may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be served and filed not later than **February 29, 2008**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED:   January 14, 2008

Jan M. Adler
U.S. Magistrate Judge

23

07cv752